ST. PAUL (WARREN v.). See Case No. 17,199.

ST. PAUL & C. RY. CO. (McLEAN v.). See Cases Nos. 8,892 and 8,893.

ST. PAUL & P. R. CO. (HOPKINS v.). See Case No. 6,690.

ST. PAUL & P. R. CO. (KENNEDY v.). See Cases Nos. 7,706 and 7,707.

ST. PAUL & P. R. CO. (WETMORE v.). See 3 Fed. 177.

ST. PAUL & S. C. R. CO. (CHAMBERLAIN v.). See Case No. 2,578.

---

## Case No. 12,244.

ST. PAUL FIRE & MARINE INS. CO. v. The LAKE SUPERIOR. CITIZENS' INS. CO. v. SAME. AMERICAN CENT. INS. CO. v. SAME.

[7 Chi. Leg. News, 259; 5 Ins. Law J. 73.]

District Court, D. Minnesota. March 20, 1875.

ADMIRALTY—JURISDICTION—INSURANCE—SUBROGATION—DUTY OF PILOTS.

1. *Held,* that the claimant by pleading to the merits has waived any irregularity existing on account of filing the libel at a time when the vessel was not within the district.

2. The libelants having paid the amount of insurance upon the freight which is alleged to have been lost through the fault of the steamboat Lake Superior, are by proper proceedings subrogated to all the rights of the original owners, and they have full authority to institute these suits to enforce their several claims.

3. The court on reviewing the evidence comes to the conclusion that the claim is not stale.

4. The court states the duty of pilots of steamers passing each other on the Mississippi river.

In Admiralty.

The above entitled suits have been consolidated for trial and argument. These are actions growing out of a collision which occurred Oct. 16, 1872, about 4 p. m., on the Mississippi river, near the town of Louisiana, in the state of Missouri, between the steamboats Northwestern and Lake Superior. Both vessels were descending the river, the Northwestern with two loaded barges in tow, one on each side, and the Superior "flying light," or nearly so, without barges. The Superior was astern, and had made a crossing of the river, which brought her nearer the Missouri or western bank, and had straightened down, so that both vessels were in the regular steamboat channel. When the Superior had reached within 50 or 100 yards of the Northwestern, she blew her whistle to pass to the starboard, which was favorably answered. At that time the Northwestern was about 250 feet from the Missouri shore, and about one-fourth of a mile above the usual steamboat landing in Louisiana. The Missouri shore at this point was rocky, with large stones and boulders lying in the river. The Superior, in passing the Northwestern, struck her starboard barge on the after quarter with

her larboard wheel, walking up on it, breaking in the deck and causing it to sink. The grain and other freight in the barge that was struck being insured by the libelants, each has libeled the steamboat Lake Superior, claiming to have been subrogated to all the rights of the original owners. The libelants allege that the Superior was wholly at fault, while the claimant insists that the collision occurred for the reason that the pilot of the Northwestern, after he had answered the signal of the Superior, crowded her, and when she was passing and abreast of her, carelessly, and negligently, and unskillfully put his wheel hard to port, thereby causing the stern of the barge in tow on her starboard side to swing under the guard of the Superior just forward of her larboard wheel, and that it was impossible, on account of this faulty movement, for the steamer's wheel to avoid striking the barge. The Keokuk Northern Line Packet Company intervene as owners of the steamboat.

J. Ham Davidson, for libelants.

Davis, O'Brien & Wilson and William Hull, for claimant.

NELSON, District Judge. Several questions preliminary to the merits have been raised by the proctors for the claimant, and must be passed upon.

Jurisdiction.—The question raised in regard to the jurisdiction of the court is, in my opinion, against the claimant. The libel was filed upon the 29th of April, 1874, and the seizure under the process was made May 15th, following. The libel contained the usual allegation that the vessel was within the district, and it is undisputed that the seizure was made here. The claimant without objection intervenes, enters its appearance, and provides the necessary stipulation for the release of the vessel. Subsequently an answer was put in which went to the merits of the controversy, although it contained an allegation that the vessel was not within the jurisdiction of the court at the time the libel was filed. I am of opinion, inasmuch as no question is raised as to the service of the process within the district, the claimant, by pleading to the merits, has waived any irregularity existing on account of filing the libel at a time when the vessel was not within the district.

Insurance and Subrogation.—The libelants having paid the amount of insurance upon the freight which is alleged to have been lost through the fault of the steamboat Lake Superior, are by proper proceedings subrogated to all the rights of the original owners, and they have full authority to institute these suits to enforce their several claims. It is sufficient to say that in my opinion the proof of insurance is ample.

Staleness of Claim.—The claims are not stale. The collision occurred Oct. 16, 1872. At that time the steamboat Lake Superior was owned by the Northern Line Packet Company. March 13, 1873, she was sold to the Keokuk Northern Line Packet Company, the claimant defending, a company organized by a consolidation or purchase of the property of several packet companies, including "The Northern Line Packet Company," and "The Keokuk Packet Company," but although the transfer of the vessel was made at that time, the purchase price was not paid until some time in March, 1874. The officers of the claimant were fully advised of the claims made by the insurance companies before the purchase price was paid, and during the summer of 1873, and further the payment was made in the stock of the new company. The libelants were also for some time attempting a settlement without suit by negotiation, and as soon as they were convinced this could not be done, commenced these proceedings in admiralty.

Finding of Facts.—We come now to the merits of the controversy, and as the libelants do not allege the loss to have occurred through any fault of the Northwestern towing the barge, they can only recover upon the ground that the Superior was solely at fault, and that there was no negligence on the part of the Northwestern.

As usual in cases of collision, the testimony of the persons connected with the two boats is considerably in conflict, but from all the testimony introduced, I have been enabled to arrive at a satisfactory conclusion. On October 16, 1872, the collision took place near Louisiana landing, in the state of Missouri. The steamboat Northwestern, with two loaded barges in tow, and the steamboat Superior flying light, without any barges, were descending the Mississippi river. The Northwestern was ahead, followed by the Superior, and both boats were headed for the Louisiana landing. When the Superior had reached within fifty or a hundred yards of the Northwestern, and being nearer the Missouri shore, or west side of the river, than the latter, blew her whistle to pass on the starboard, or Missouri side, which was answered favorably. The Superior, when she reached the Northwestern and was in the act of passing, struck the starboard tow of the Northwestern "walking up" on the stern of the barge quartering, wounding it so that the loss complained of occurred. At the time of the collision, the Superior was distant on her starboard side about two hundred and fifty feet from the Missouri shore, and the Northwestern about five or six hundred yards from the Illinois shore, on her larboard side. There was plenty of room for the Superior to have passed the Northwestern on the larboard side when she whistled for the starboard. The Missouri shore and the bottom of the river at the place of collision was rocky and sandy, and the Superior could not with safety have gone nearer in attempting to pass than she did—if, however, she had slowed her engines, and run carefully, she could have passed on the starboard side of the Northwestern, unless the latter had turned toward either shore. After the

signals were exchanged the pilot of the Northwestern turned her bow to the larboard, and when the Superior came up alongside he kept her as nearly steady as possible. As the Superior commenced lapping on, the course of the Northwestern was again changed a little to larboard, which brought the barge in front of the Superior's wheel. The Superior did not slacken her speed after she gave the signal to pass, but kept right on and put herself in such near proximity that the gradual holding of the bow of the Northwestern to larboard when the Superior was abreast, rendered the collision unavoidable.

Conclusions.—It was the duty of the Superior to have exercised very great precaution when she gave the signal to pass on the Missouri side, which was stony and sandy at the point where the collision took place, particularly as there was plenty of room and water on the larboard side of the Northwestern. Under the 17th article of the act of congress of April 29, 1864 [13 Stat. 58], it was her duty to keep out of the way of the Northwestern, and if she desired to pass to the starboard when the Northwestern was heading for a landing on that side, less than one-fourth of a mile distant, she took the chances of there being sufficient and safe navigation to permit her passage under the circumstances. The 8th rule for the government of pilots which took effect January 1st, 1872, reads as follows: Rule 8th: "When steamers are running in the same direction, and the pilot of the boat which is astern shall desire to pass either side of the boat ahead, he shall give the signal as in rule 1, (viz.: one sound of the whistle to keep to the right, and two sounds to keep to the left,) and the pilot of the boat ahead shall answer by the same signal, or if he prefer to keep on his course, he shall make the necessary signals, and the boat wishing to pass must govern herself accordingly, but the boat ahead shall in no case attempt to cross her bow or crowd upon her course." This rule has reference in its application to the circumstances under which a passage is made. The boat ahead must not crowd or attempt to cross the bow of the boat astern, yet the latter boat must keep out of the way, and be governed in her efforts to pass so as to avoid a collision.

The signal of the Superior when answered gave her the right to pass to the starboard, and governed the pilot of the Northwestern in the management of his vessel, but the 8th rule when interpreted in the light of the 17th, 18th, 19th and 20th articles of the act of congress, of April 20th, 1864 [supra], cannot excuse bad management on the part of the Superior, or the neglect of any proper precaution on the part of her officers. The Superior thus attempting to pass to starboard suffered the vessels to get into dangerous proximity, and was in fault. The Northwestern was not justified in holding her bow to the larboard when she found the Superior was passing. The character of the shore and bottom of the river

on the starboard side, and her position should have prevented a favorable answer to the signal of the Superior, but when the pilot had given the starboard side to her, he should not have executed the movement he did by porting the helm just as the Superior came abreast. The sudden turn of the bow was a faulty movement, and cannot be excused. It contributed to bring about the collision, and there was no emergency that demanded it.

The vessel towing the barge being equally at fault there can be no recovery in these suits, and the libels must be dismissed. Decrees accordingly.